**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 13-136-DLB-CJS**

**TIFFANY GORDON**                                                                               **PLAINTIFF**

**vs.**                              **MEMORANDUM OPINION AND ORDER**

**TENORRIS F. TURNER, et al.**                                                   **DEFENDANTS**

******************

## I.      Introduction

This negligence action arises from a traffic collision that occurred on the exit ramp from Southbound I-75 to U.S. Highway 42 in Boone County, Kentucky.  Defendant Tenorris Turner was driving a tractor-trailer for Defendant Pallet Companies, Inc., doing business as IFCO Systems, LLC ("IFCO"), when he rear-ended Plaintiff Tiffany Gordon's sedan, causing a chain-reaction collision.  At the time of the accident, Turner was employed by Defendant Midwest Construction Services, Inc., doing business as Trillium Driver Solutions ("Trillium"), a staffing company that provides clients like IFCO with temporary drivers. Gordon sued Turner, IFCO, and Trillium, as well as Defendant Universal Fleet, the maintenance company that last inspected and serviced the trailer.  All four Defendants now move for summary judgment on Gordon's claims, arguing that she has failed to prove the elements of negligence and cannot justify an award of punitive damages.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

1

II.     **Factual and Procedural Background**

On June 14, 2013, Gordon was driving her 2011 Chevrolet Cruze in the right lane of the southbound exit ramp from I-75 to U.S. Highway 42 in Boone County, Kentucky. (Doc. # 125-2 at 2-3).  Turner, en route to an IFCO client with a load of pallets, was driving a tractor-trailer just behind Gordon.  (*Id.*).  As traffic slowed, Turner hit Gordon's Chevy from behind, propelling it into the vehicle ahead and sparking a chain reaction crash that involved three other vehicles.  (*Id.*).  Gordon's Chevy then spun counter-clockwise, only to be hit by the tractor-trailer again.  (*Id.*).  The tractor-trailer came to rest with its grill embedded in the driver's side door of Gordon's Chevy.  (*Id.*).

Deputies from the Boone County Sheriff's Office responded to the accident scene. (*Id.*).  According to their report, Gordon complained of bruising but refused immediate medical attention, saying that she would seek treatment independently.  (*Id.*).  None of the other drivers involved in the chain-reaction collision were injured.  (*Id.*).  Turner reportedly told the deputies that he tried to apply his brakes, but the tractor-trailer sped up on him. (*Id.*).  He further stated that he pumped the brakes in an effort to stop, but was unable to do so.  (*Id.*).  The deputies also spoke with one of the other motorists involved in the crash, who said that he noticed a loose brake line hanging from the trailer just after the accident. (*Id.*).  He said he pointed this out to Turner, who then reattached the line.  (*Id.*).

Turner contacted Trillium's branch manager, Jason Sump, and told him about the accident.  (Doc. # 131-1 at 4).  Sump drove to the scene, picked Turner up and took him to a nearby clinic for a drug test.  (*Id.* at 48-49).  The results of that test were negative. (*Id.*).  Sump also discussed the accident with Turner and took notes on their conversation.

2

(*Id.* at 41).  Those notes are consistent with the statements Turner made to the deputies at the accident scene.  (*Id.* at 6-7; Doc. # 125-2 at 2-3).

Meanwhile, two of the deputies performed a field inspection of the tractor and trailer.  (*Id.*; Doc. # 123-2).  They discovered an inoperable required lamp, three clamp brakes out of adjustment and an air leak in the brake tubing on the trailer.  (*Id.*).  They also noted that at least 20% of the service brakes on the trailer were defective.  (*Id.*).  Because of these defects, the deputies deemed the trailer to be "out of service," meaning that it could not be operated until IFCO made the necessary repairs.  (*Id.*).

The record reflects that Universal Fleet, a maintenance company that IFCO retained on an as-needed basis, serviced the trailer just two months before the accident.  (Docs. # 123-3 and 131-2 at 72).  Specifically, Universal Fleet conducted an annual inspection of the trailer, as required by the Federal Highway Administration ("FHWA"), to ensure that it was road-worthy.  (Doc. # 127-2 at 14, 27 and 46).  As part of that inspection, Universal Fleet greased and adjusted various components of the trailer, including the brakes, and replaced a rusty maxi chamber.[1]  (*Id.*).

After the accident, IFCO retained Universal Fleet to correct the defects discovered by the deputies.  (Doc. # 123-4 and 125-3).  It also asked Universal Fleet to conduct its own investigation into the cause of the accident.  (Doc. # 131-2 at 23).  According to Universal Fleet's owner, Michael Terry, the defective brakes were not the cause of the accident.  (Doc. # 127-2 at 22).  He explained that the brakes were only slightly out of alignment.  (*Id.* at 23).  The federal regulations allow for one to two inches of adjustment,

---

1) A maxi chamber is a brake chamber attached to the trailer's suspension.  (Doc. # 127-2 at 14).

or travel, on the brakes.  (*Id.*).  The third brake on the left axle of the trailer had two and a quarter inches of travel, while the fourth brake had two and an eighth inches of travel on both the left and right axles.  (*Id.*).

IFCO also offers expert testimony from Neil Gilreath, a police officer with experience in accident reconstruction, who opined that the brakes could not have caused the accident. (Doc. # 127-4).  That being the case, IFCO concludes that the accident must have been Turner's fault.  (Doc. # 129-6).  Gordon responds with expert testimony from Dr. Scott Noll, a mechanical engineer, who asserts that the brakes were indeed the cause of the accident. (Doc. # 127-3).  The police report does not identify a clear cause of the accident.  (Doc. # 125-2 at 2-3).  Instead, it states that the accident was caused by a combination of driver inattention, defective brakes and unspecified "other" factors.  (*Id.*).  Therefore, the precise cause of the accident is still unknown, as evidenced by these conflicting opinions.

Turner, a Trillium employee, was driving the tractor-trailer on behalf of IFCO that day.  (Docs. # 123-5 at 2; 131-1 at 12).  At that time, Trillium and IFCO had a services agreement, pursuant to which Trillium hired, trained, and supplied IFCO with temporary drivers.  (Doc. # 131-2 at 12).  Because Trillium staffed these temporary drivers, IFCO did not directly compensate them for their services.  (*Id.* at 3).  Instead, IFCO paid Trillium, and Trillium paid the drivers.  (*Id.*).  IFCO was only responsible for supervising the temporary drivers while they worked on IFCO's behalf.  (*Id.* at 12).  Turner had worked for Trillium on other assignments for one year without incident.  (Doc. # 131-1 at 27).  The day of the accident was Turner's first day on assignment to IFCO.  (*Id.*).

Trillium maintains that it performed a background check, verified Turner's last three

years of employment, obtained a copy of his CDL, reviewed his medical card, and ensured that he was compliant with Department of Transportation ("DOT") regulations before hiring him. (*Id.* at 15-22). Trillium also obtained a Motor Vehicle Report ("MVR") and Drive-A-Check Report ("DAC") for Turner. (Docs. # 129-4 and 129-5). These reports indicated that Turner had a valid commercial driver's license ("CDL") and ten years of commercial driving experience with multiple employers. (Doc. # 129-4). Within the previous three years, he had two speeding citations and a misdemeanor conviction for exceeding the maximum axle load. (*Id.*). He also had one DOT recordable crash[2] and one non-DOT recordable crash, both involving stationary objects, within that time period. (*Id.*). According to Debarah Scott, an Area Manager for Trillium, Turner's record passed muster under federal regulations, as well as Trillium's hiring standards. (Doc. # 131-1 at 16-25 and 60-70). Although Trillium contacted some of Turner's former employers, it was unsuccessful in obtaining much information from them. (*Id.*). Trillium ultimately verified the dates of employment through the MVR and DAC, but did not resolve any lingering questions about the circumstances of Turner's departure from those companies.[3] (*Id.*).

Scott admitted that Trillium received an incomplete Medical Examination Report for Turner. (*Id.* at 30-31). Although the examiner indicated that Turner was taking medication for high blood pressure, he did not complete the sections asking about Turner's onset date

---

2) A DOT-recordable accident meets the DOT definition for "accident" as set forth in Section 390.5 of the Federal Motor Carrier Safety Regulations, codified at 49 C.F.R. § 390.5. (Doc. # 129-5). According to Scott, an applicant is not eligible for employment if they have had a DOT-recordable accident in the previous year. (Doc. # 131-1 at 23). Turner's DOT-recordable crash occurred about two years before he applied to Trillium. (Doc. # 129-5 at 20).

3) On his Trillium employment application, Turner indicated that he quit certain jobs, but the DAC reports that he was "discharged" or that the "company terminated lease." (Doc. # 129-5). Scott testified that these phrases can denote a variety of occurrences besides simple firing. (Doc. # 131-1 at 16-25).

5

and diagnosis.  (*Id.*).  Instead, the examiner only recorded one blood pressure reading, instead of the required two readings.  (*Id.*).  The form states that a driver is qualified if his blood pressure reading is less than 140/90.  (*Id.*).  Turner's blood pressure was 146/91.  (*Id.*).  Scott did not know why the examiner had left these parts of the Report blank.  (*Id.*).  When asked why Trillium did not follow up on Turner's conditions, Scott stated that "[a]pparently somebody missed it."  (*Id.*).

Upon hiring, Turner sat through orientation, watched a driver safety video, and received alcohol awareness and hazardous materials training.  (Doc. # 131-1 at 13-15).  He was also given a hiring packet, employee handbook, and a copy of the National Motor Federal Safety Regulations.  (*Id.* at 16). Some of Trillium's clients also required temporary drivers to undergo additional training.  (*Id.* at 38-39).  For example, Turner completed Protread safety training while on assignment to Ryder Logistics.  (*Id.*; Doc. # 129-2 at 2).  IFCO did not have any additional training requirements.  (*Id.*).

On August 1, 2013, Gordon filed this negligence action against Turner and IFCO.  (Doc. # 1).  She amended the complaint on two occasions to assert additional claims against Trillium and Universal Fleet.[4]  (Doc. # 32 and 51).  The parties completed their discovery efforts almost two years after the filing of this action.  (Doc. # 86).  Defendants then filed their Motions for Summary Judgment (Docs. # 123, 125, 128 and 129), which are fully briefed and ripe for the Court's review.  (Docs. # 132,133, 134, 135, 139, 140, 141 and 142).

---

4) In her Second Amended Complaint (Doc. # 51), Gordon named Penske Leasing and Rental Company as a Defendant.  IFCO leased the tractor involved in the accident from Penske.  (Doc. # 129-6).  However, Penske was later dismissed from this action by agreement of the parties.  (Doc. # 122).

III.    **Analysis**

   A.    *Applicable Law*

   Federal courts sitting in diversity apply federal procedural law.  *Hanna v. Plumer*, 380 U.S. 460, 465 (1965).  The substantive law of the forum state governs the claims asserted.  *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938); *Moore v. Coffey*, 992 F.2d 1439 (6th Cir. 1993); *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).  Accordingly, the Court will evaluate Defendants' Motions in accordance with the Federal Rules of Civil Procedure and apply substantive Kentucky law to Gordon's negligence-based claims.

   B.    *Standard of Review*

   Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id*. at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

7

### C.   Negligence Claim Against Universal Fleet

#### 1.   Breach of Duty

"A common law negligence claim requires proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003) (referring to the third and fourth elements jointly as "consequent injury")).

"Kentucky courts recognize a universal duty of care under which every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *Lee v. Farmer's Rural Elec. Co-op Corp.*, 245 S.W.3d 209, 212 (Ky. Ct. App. 2007) (internal quotations omitted). Ordinary care is "such care as a reasonably prudent person would exercise under the circumstances." *Slusher v. Brown*, 323 S.W.2d 870, 872 (Ky. 1959). Foreseeability is "determined by viewing the facts as they reasonably appeared to the party charged with negligence, not as they appear based on hindsight." *James v. Wilson*, 95 S.W.3d 875, 891 (Ky. Ct. App. 2002). The existence of a duty is a question of law for the Court to decide. *Pathways, Inc.*, 113 S.W.3d at 88-89.

By contrast, whether a duty has been breached is a question of fact for the jury to decide. *Pathways, Inc.*, 113 S.W.3d at 88-89. So long as there is a genuine dispute as to a material fact concerning breach, such that a reasonable jury could find that the defendant was negligent, the Court is precluded from granting summary judgment. *Id.*; *see also Simons v. Strong*, 978 F. Supp. 2d 779, 783-84 (E.D. Ky. 2013) (stating that summary judgment is only appropriate if there is a "complete absence" of evidence that the

8

defendant breached a duty owed to the plaintiff).

Under Kentucky law, Universal Fleet had a duty to exercise ordinary care in inspecting and servicing IFCO's trailer. *Lee*, 245 S.W.3d at 212. This begs the question: Is there genuine issue of material fact regarding breach, such that a reasonable jury could find that Universal Fleet was negligent in servicing IFCO's trailer? Universal Fleet answers this question in the negative, insisting that there is a complete lack of evidence regarding breach. Gordon counters with two pieces of evidence, which the Court will consider in turn.

Gordon first relies on the testimony of Universal Fleet's owner, Michael Terry, to establish a breach of duty. According to her, Terry admitted that his mechanics may have overlooked the brake conditions while servicing the trailer. (Doc. # 132 at 2). This is an oversimplification of Terry's testimony. To be precise, Terry expressed confidence in the work of his mechanics, stating that he did not believe they were negligent. (Doc. # 127-2 at 42). However, when repeatedly pressed about the possibility of a mistake, Terry acknowledged that "[a]nything is possible." (*Id.*). Contrary to Gordon's assertion, this statement does not qualify as an admission of faulty service.

Next, Gordon asserts that Terry "admitted to allowing the trailer, without an up-to-date FHWA inspection, to go on the road without notifying IFCO that it was not up-to-date, performing the inspection, and/or sidelining the trailer until the inspection was complete." (Doc. # 132 at 3-4). This is an incomplete summary of the testimony provided. During the deposition, Gordon's attorney produced evidence that IFCO's trailer went without an annual FHWA inspection from April 12, 2011 to February 11, 2013, a period of twenty-two months. (Doc. # 127-2 at 45). However, the record indicates that IFCO switched maintenance companies during this time period. (*Id.* at 44). Dickinson Fleet Services

9

performed the April 2011 inspection.  (*Id.*).  Then, in November of that year, Universal Fleet

repaired roof damage to the trailer.  (*Id.*).  The trailer was already six months overdue for

an inspection at that time, but that fact may not have been readily apparent to Universal

Fleet.  After all, Universal Fleet was not yet familiar with this client or this trailer.  (*Id.*).

Although Michael Terry testified that his mechanics could have checked a database

to determine whether the trailer was due for an FHWA inspection, he indicated that

Universal Fleet was not solely responsible for keeping trailers up-to-date on FHWA

inspections.[5]  (*Id.*).  Sometimes Universal Fleet notified clients that they were due for an

annual inspection, but clients often contacted Universal Fleet with inspection requests as

well.  (*Id.*).  IFCO's representative, LeRoi Cochran, testified to the same effect.  (Doc. #

131-2 at 32-34, 72).

Even if Universal Fleet was negligent in allowing the trailer to go on the road without

a current FHWA inspection in November 2012, that conduct has no temporal connection

to Gordon's alleged injuries, nor is it factually similar to the negligence alleged in this case.

The record reflects that Universal Fleet performed an FHWA inspection in February 2013,

and again on April 16, 2013.  (*Id.*).  Therefore, the trailer was up-to-date on its annual

inspection at the time of the accident.[6]  (*Id.*).  Gordon is simply trying to demonstrate that

Universal Fleet must have been negligent in servicing the brakes on April 16, 2013

because it negligently overlooked the need for an FHWA inspection in November of 2012.

---

5) Terry also explained that companies commonly let their annual inspections lapse while the trailer was sitting
on the lot.  (*Id.*).  When it came time to use the trailer, someone from the companies would contact Universal
Fleet and a mechanic would go to their place of business and conduct the FHWA inspection.  (*Id.*).

6) It is unclear why two FHWA inspections were performed on the trailer within a two-month period.  (Doc. #
127-2 at 45).

10

This anecdotal evidence is of limited value, at best.

In sum, Gordon's flimsy suppositions are insufficient to create a genuine issue of material fact as to Universal Fleet's alleged breach of duty.  However, even Gordon's assertions were sufficient to create a genuine issue of material fact, her claim would nevertheless fail on the issue of causation, as the Court will explain below.

### 2.    Causation

The Kentucky Supreme Court has adopted the substantial factor test for causation, set forth in the Restatement (Second) of Torts § 431.  *Pathways, Inc.*, 113 S.W.3d at 92. Under this test, the "actor's negligent conduct is a legal cause of harm to another if his conduct is a substantial factor in bringing about the harm." *Id.* (quoting Restatement (Second) of Torts § 431).  The term "substantial factor" is explained as follows:

> In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. . . [T]his is necessary, but it is not of itself sufficient.  The negligence must also be a substantial factor in bringing about the plaintiff's harm.  The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred.  Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

Restatement (Second) of Torts § 431, cmt. a.

The Restatement further provides that lapse of time is an important consideration "in determining whether the actor's conduct is a substantial factor in bringing about harm to another."  Restatement (Second) of Torts, § 433(3).  "Experience has shown that where a great length of time has elapsed between the actor's negligence and harm to another,

a great number of contributing factors may have operated, many of which may be difficult or impossible of actual proof." *Id.* at cmt. f.  In some cases, "the effect of the actor's conduct may thus have become so attenuated as to be insignificant and unsubstantial as compared to the aggregate of the other factors which have contributed." *Id.*  "However, where it is evident that the influence of the actor's negligence is still a substantial factor, mere lapse of time, no matter how long, is not sufficient to prevent it from being the legal cause of the other's harm." *Id.*

Causation is a mixed question of law and fact. *Pathways, Inc.*, 113 S.W.3d at 89. "The court has a duty to determine 'whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff.'" *Id.*  "[C]ausation should not go to the jury unless the inference of causation is reasonable: it must "indicate the *probable,* as distinguished from a *possible* cause." *Bailey v. N. Am. Refractories Co.*, 95 S.W.3d 868, 873 (Ky. Ct. App. 2001).

Gordon asserts that the brakes "are the most obvious and most likely cause of the crash." (Doc. # 132 at 2).  In support of this proposition, she cites the deputies' field inspection, as well as her expert witness's testimony.  Gordon's expert, Dr. Noll, rejected the notion that the accident caused the brakes to slip out of alignment, opining instead that the misaligned brakes caused the accident on June 14, 2013.  (Doc. # 127-3 at 16). Because Universal Fleet was the last entity to service the brakes, Gordon concludes that there must be a causal connection between the maintenance performed in April and the accident in June.  She insists that "[a]rguing that a causal link between the two is

12

impossible is like arguing that showing a causal link between a puddle of water and a slip and fall is impossible."  (*Id.*).

Even if Gordon is correct in asserting that the misaligned brakes were a substantial factor in causing the accident, she has not produced any evidence attributing their defective condition to Universal Fleet's repair work.  If the accident had occurred a day or even a week after Universal Fleet inspected the brakes, then perhaps a reasonable juror could infer that there is a causal connection between these two events.  Here, by contrast, two months passed between Universal Fleet's maintenance and the accident.  Because the record is silent as to how the trailer was used during those two months, if at all, there are "a great number of contributing factors may have operated, many of which may be difficult or impossible of actual proof."  *See* Restatement (Second) of Torts § 433, cmt. f. Under these circumstances, Gordon can only contend that a causal connection is possible. She certainly has not established that a causal connection is probable.

### 3.   *Res Ipsa Loquitur*

Although she does not explicitly identify it as such, Gordon last advances a *res ipsa loquitur* theory of liability.  "A *res ipsa loquitur* case is ordinarily merely one kind of case of circumstantial evidence, in which the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it." Restatement (Second) of Torts, § 328D, cmt. b; *see also Perkins v. Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992) (citing the Restatement and explaining further that "*res ipsa loquitur* is a Latin phrase, which means nothing more than the thing speaks for itself, and is simply one type of circumstantial evidence") (internal quotations omitted).  Specifically,

13

Gordon argues that Universal Fleet must have been negligent because it was the last entity to service the trailer's brakes, which she characterizes as the "most likely" cause of the crash.  (Doc. # 132 at 2).

"Reliance upon the doctrine of *res ipsa loquitur* is predicated upon a showing that (1) the defendant had full control of the instrumentality which caused the injury; (2) the accident could not have happened if those having control had not been negligent; and (3) the plaintiff's injury resulted from the accident."  *Ryan v. Fast Lane, Inc.*, 360 S.W.3d 787, 790 (Ky. 2012) (citing *Sadr v. Hager Beauty School, Inc.*, 723 S.W.2d 886, 887 (Ky. Ct. App. 1987)).

As for the first element, the trailer may have been within Universal Fleet's control at the time of maintenance, two months before the accident, it had been in IFCO's custody ever since.[7]  Kentucky law suggests that this is not sufficient to satisfy the first prong of the *res ipsa loquitur* test.  *See, e.g., Ryan*, 360 S.W.3d at 790 (finding that the defendant gas station did not have exclusive control over the allegedly defective gas pump because the plaintiff was operating it at the time of the accident).  However, even if the Court were to assume that Gordon satisfied the first element, she would not be able to meet the second.

In analyzing the second element, the Kentucky Court of Appeals made the following observations:

---

7) The Restatement (Second) of Torts, § 328D suggests a more nuanced approach to the first element in Comment g.  It states that the defendant may be responsible where he shares control of the instrumentality with another, where he is under a duty to control the conduct of a third person, or where he was formerly in control of the instrumentality, provided that there is sufficient evidence to eliminate the responsibility of intermediaries.  However, Kentucky courts have cited § 328D and several of its Comments with approval, but the Court is unaware of any case relying on Comment g.  Instead, Kentucky courts seem to have utilized the more direct analysis exemplified in *Ryan*.  However, even if the Court were to examine Gordon's *res ipsa loquitur* theory under Comment g's rubric, it would fail.  Although Universal Fleet may have once had control of the instrumentality, Gordon has not presented sufficient evidence to eliminate the responsibility of intermediaries, as the Court has already explained.

14

The fact that some mystery accompanies an accident does not justify the application of the doctrine of *res ipsa loquitur*. The fact that we cannot pinpoint an act of omission or commission wherein one fails to respect the rights of others does not summon its use. A lack of knowledge as to the cause of the accident does not call for application of the doctrine. The separate circumstances of each case must be considered and from them it must be first decided whether according to common knowledge and experience of mankind, this accident could not have happened if there had not been negligence.

*Cox v. Wilson*, 267 S.W.2d 83, 84 (Ky. 1954).

Having reviewed the evidence in detail, the Court simply cannot conclude that this car accident could not have happened, absent some negligence on the part of Universal Fleet. The record reflects that a number of factors may have contributed to this accident, such as driver inattention, wear and tear or unknown factors that came into play after IFCO regained control of the trailer. As the case law cited above indicates, a mere mystery surrounding an accident does not justify the use of *res ipsa loquitur*. Because Gordon has failed to convince this Court that a jury may reasonably infer both negligence and causation from the mere occurrence of the accident and Universal Fleet's relation to it, Universal Fleet is entitled to summary judgment on Gordon's negligence claim.

### D.   Negligence Per Se Claim Against Universal Fleet

"Negligence *per se* is merely a negligence claim with a statutory standard of care substituted for the common law standard of care." *Pile v. City of Brandenburg*, 215 S.W.3d 36, 41 (Ky. 2006) (citing Ky. Rev. Stat. Ann. § 446.070 ("[A] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation.")). In order to sustain a claim for negligence *per se*, the plaintiff must establish that he or she is a member of the class of persons the statute was designed to

15

protect and that his or her injury is the type of injury that the statute was designed to prevent.  *Simons*, 978 F. Supp. 2d at 784.

First, Gordon attempts to establish that Universal Fleet violated KRS § 189.224, which makes it unlawful for "the owner, or any other person, employing or otherwise directing the operator of any vehicle, to require or knowingly to permit the operation of such vehicle upon a highway in any manner contrary to law."  As a preliminary matter, Universal Fleet does not own the trailer, nor does it employ or otherwise direct the operation of the trailer.  (Doc. # 127-2 at 14, 27 and 42-46).  It acts merely as a maintenance provider, servicing and inspecting the trailer on an as-needed basis.  (*Id.*).  Moreover, because the term "knowingly modifies 'in any manner contrary to law,'" Universal Fleet can only be liable under KRS § 189.224 if it knowingly gave the trailer back to IFCO with misaligned brakes. *Christensen v. ATS, Inc.*, 24 F. Supp. 3d 610, 615 (E.D. Ky. 2014).  Such allegations are not only inconsistent with Gordon's negligence-based claims against Universal Fleet, they are devoid of factual support in the record. Accordingly, Gordon's negligence *per se* claim fails, to the extent that it is predicated on a breach of KRS § 189.224.

Gordon next seeks to prove that Universal Fleet violated a number of federal regulations.  However, Kentucky law clearly states that neither "[v]iolations of federal laws and regulations" nor violations of "the law of other states" create a cause of action based on KRS § 446.070.  *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011); *see also Alderman v. Bradley*, 957 S.W.2d 265, 266 (Ky. Ct. App. 1997).  Because Gordon failed to establish that Universal Fleet breached any duties imposed by Kentucky statutes,

16

her negligence *per se* claim cannot survive.

Even if Gordon could demonstrate that Universal Fleet breached a statutory duty, Kentucky law still requires her to prove cause and injury. *Stivers v. Ellington*, 140 S.W.3d 599, 601 (Ky. Ct. App. 2004). As the Court explained above, Gordon has fallen far short of establishing a causal connection between the maintenance performed by Universal Fleet on April 16, 2013 and the injuries Gordon suffered on June 14, 2013. Universal Fleet is therefore entitled to summary judgment on Gordon's negligence *per se* claim.

### E. Vicarious Liability Against Trillium

"[T]he doctrine of respondeat superior, or vicarious liability, imposes strict liability upon an employer by virtue of its relationship with a tortfeasing employee." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 734 (Ky. 2009). Specifically, "[a] principal is vicariously liable for damages caused by tort of commission or omission of an agent or subagent, other than an independent contractor, acting on behalf of and pursuant to the authority of the principal." *Williams v. Ky. Dept. of Ed.*, 113 S.W.3d 145, 151-52 (Ky. 2003); *see also Roethke v. Sanger*, 68 S.W.3d 352, 360-61 (Ky. 2001) (explaining that the test is the same regardless of whether the agency relationship is a partnership, principal/agent or master/servant relationship).

Under the loaned servant doctrine, "[a] servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the person to whom he is loaned or hired, and to impose on the latter, the usual liabilities of a master, the general or original master being correspondingly relieved." *Carnes v. Dep't of Econ. Sec.*, 435 S.W.3d 758, 761 (Ky. Ct. App. 1968); *see also Duckwall-Kennady v. United*

17

*States*, Civ. A. No. 5:13-cv-68-JMH, 2013 WL 3480739, at *3 (E.D. Ky. July 10, 2013) (explaining that "the original employer actually loans the employee to the special employer"). "In borrowed servant cases, agency for one party is only destroyed by agency for another if the fulfillment of one role requires the abandonment of the other." *Nazar v. Branham*, 291 S.W.3d 599, 607 (Ky. 2009). Thus, "a person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve the abandonment of the service to the other." *See City of Somerset v. Hart*, 549 S.W.2d 814, 817 (Ky. 1977).

Trillium admits that it employed Turner at the time of the accident. (Doc. # 129). However, it argues that it is not vicariously liable for Turner's negligence because he was driving IFCO's trailer on IFCO's behalf at the time of the accident. (*Id.*). While Turner was "loaned" to IFCO at the time of the accident, his driving duties for IFCO did not require him to abandon his role at Trillium. Because Trillium's business is staffing temporary drivers to its clients, Turner was actually furthering its enterprise by fulfilling his duties for IFCO. Accordingly, Trillium is not entitled to summary judgment on Gordon's vicarious liability claim.[8]

### F.    Negligent Hiring and Retention Claim Against Trillium[9]

While the above-mentioned claim involved the imposition of strict liability on the employer, this negligent hiring or retention claim "focuses on the direct negligence of the

---

8) IFCO has already accepted liability for this accident. Although it is unclear whether it accepted liability on a respondeat superior basis or direct liability basis, the Court's analysis does not necessarily undermine this admission of liability, as indicated by *City of Somerset*.

9) Gordon also asserted claims for negligence and negligence *per se* against Trillium, based on its alleged failure to maintain the trailer. (Doc. # 51). She has since conceded that summary judgment is appropriate on this claim, as Trillium did not own or maintain the trailer at issue in this case. (Doc. # 135).

employer which permitted an otherwise avoidable circumstance to occur." *Brooks*, 283 S.W.3d at 734.  Under Kentucky law, "a plaintiff may assert and pursue in the same action a claim against an employer based under *respondeat superior* upon the agent's negligence, and a separate claim based upon the employer's own direct negligence in hiring, retention, supervision or training." *MV Transp., Inc. v. Allgeier*, 433 S.W.32 324, 337 (Ky. 2014).  After all, "[t]he employer's admission to the existence of an agency relationship from which vicarious liability may arise does not supplant the claim that the employer's own negligence, independent of the negligence of the employee, may have caused or contributed to the injury." *Id.*

"In order for an employer to be held liable for negligent hiring or retention . . . the employee must have committed a tort." *Brooks*, 283 S.W.3d at 727 (explaining further that the underlying tort may be intentional or negligent).  To prevail on a claim for negligent hiring and retention, the plaintiff must prove that: (1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed; and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff.  *Oakley v. Flor-shin, Inc.*, 964 S.W.2d 438, 442 (Ky. Ct. App. 1998) (finding that there were genuine issues of material fact as to whether an employer was negligent in hiring an employee who assaulted a young woman, where the employer allegedly knew that the employee had an extensive criminal record and would be locked alone in the store with the victim).

According to Gordon, Trillium reasonably should have known that Turner was unfit to drive a commercial vehicle based on his employment history.  Turner indicated that he

quit two of his last three jobs, but his DAC report listed "Reason for Leaving" as "Discharge or Company Terminated Lease."  (Doc. # 129-5).  Gordon sees this as a discrepancy that Trillium should have investigated further.   However, Debarah Scott testified that the notation "Discharge or Company Terminated Lease" denotes a variety of circumstances besides firing.  (Doc. # 131-1 at 17-23).  For this reason, Trillium allowed Turner to explain the circumstances of his departure from these jobs.  (*Id.*).  Kentucky law acknowledges that an employer "'must have a modicum of faith and trust in a job applicant' and is entitled to rely on an applicant's ostensibly truthful answers in an application for employment."  *M.T. v. Saum*, 3 F. Supp. 3d 617, 629 (W.D. Ky. 2014).  Therefore, even assuming that Turner's discharge explanations were not entirely accurate, Trillium's "failure to discover an applicant's dishonesty does not constitute even ordinary negligence."  *Id.* (citing *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 563 (Ky. Ct. App. 2013) (dealing with an employer's failure to discover an applicant's outright dishonesty)).

Gordon next contends that Trillium had notice of Turner's failings because his driving record revealed a misdemeanor for exceeding maximum load, two speeding tickets, and two accidents involving stationary objects, one of which was DOT-recordable.  (Doc. # 135 at 3-4).  Despite these blemishes on Turner's MVR, the record reflects that was still eligible for hire under federal regulations and Trillium's hiring standards.  (Doc. # 131-1 at 17-23).  Trillium also complied with the federal regulations requiring it to obtain copies of Turner's CDL, MVR, and DAC.  (*Id.*).  While this is not conclusive evidence of due care, courts have generally been unwilling to find that there were genuine issues of material fact as to negligent hiring and retention, so long as the employer complied with the hiring

20

practices prescribed by the Federal Motor Carrier Safety Administration.  *See Saum*, 3 F. Supp. 3d at 629 (finding that there was not a genuine issue of material fact as to negligent hiring and retention because the employer obtained a FMCSA screening report, which indicated that the employee was qualified to operate a commercial vehicle); *Carberry*, 402 S.W.3d at 563 (reaching the same conclusion based on the fact that the employer complied with all federal motor vehicle regulations before hiring the employee).

Gordon also notes that Trillium failed to obtain complete medical records for Turner and allowed him to drive with elevated blood pressure.  (Doc. # 135 at 4).  Scott seems to concede that Trillium was deficient in this respect.  (Doc. # 131-1 at 30-33).  However, there is no evidence in the record to suggest that Turner's elevated blood pressure caused or even contributed to the accident.  While Kentucky law does not explicitly identify causation as an element of a negligent hiring and retention claim, the seminal cases suggest that such a connection is necessary.  *See Brooks*, 283 S.W.3d at 731 (incorporating the issue of causation into the proposed jury instruction for negligent hiring and retention).

Finally, Gordon cites a laundry list of Turner's failings on the day of the accident as evidence that he was unfit to drive a commercial vehicle.  (Doc. # 135 at 5).  She claims that a driver with Turner's experience would have known to brake before exiting the highway and to honk or swerve upon realizing that the brakes did not function properly. (*Id.*).  She further asserts that an experienced driver would not have pumped the brakes in an effort to stop the vehicle, nor would he have reconnected the detached brake line

following the accident.  (*Id.*).  Even if Gordon's assertions are true, she cannot establish that Trillium knew or had reason to know of Turner's failings.  Because these acts and omissions occurred contemporaneously with the accident, they could not have put Trillium on notice of Turner's deficiencies as a driver.  There being no genuine issues of material fact as to whether Trillium knew or had reason to know that Turner was unfit for the job or created an unreasonable risk of harm to others, Trillium is entitled to summary judgment on this claim.

### G.    Negligent Training and Supervision Claim Against Trillium

Kentucky has also "recognized and acknowledged the existence of negligent training and supervision" claims.  *Turner v. Pendennis Club*, 19 S.W.3d 117, 121 (Ky. Ct. App. 2000).  To succeed on such a claim, the plaintiff must establish that (1) the employer knew or had reason to know of the risk that the employee created; (2) the employee injured the plaintiff; and (3) the supervision and/or retention of the employee proximately caused the injury.  *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005).

Gordon insists that Trillium failed to adequately train or supervise Turner, as it only offered him a brief orientation and courses in hazardous material training and drug and alcohol awareness.  (*Id.* at 6).  Specifically, she faults Trillium for not administering a road test or conducting a defensive driving course, as required by federal law.  (*Id.*).  However, the record reflects that Turner received Protread safety training, which included a road test and defensive driving instruction, while on assignment to Ryder Logistics.  (Doc. # 131-1

22

at 26-27).  Because Turner ultimately received such training, Gordon cannot demonstrate that Trillium's failure to directly provide such instruction proximately caused the accident.

There is also no evidence in the record to suggest that Trillium was negligent in supervising Turner while he was working under their purview.  Instead, Gordon must predicate her negligent supervision claim on Trillium's alleged failure to ensure that Turner conducted a pre-trip inspection of the tractor-trailer.  (Doc. # 135 at 7).  This argument fails because Trillium was not in a position to supervise Turner while he was at IFCO's facility preparing to drive IFCO's trailer loaded with IFCO's product to another facility.  (Doc. # 131-1 at 12-14, 25; 131-2 at 3-4).  For this very reason, Trillium and IFCO agreed that IFCO was responsible for supervising temporary drivers on assignment from Trillium.  (*Id.*). Accordingly, Trillium is entitled to summary judgment on Gordon's negligent training and supervision claims.

### H.    Punitive Damages Claim Against Trillium, IFCO, and Turner

Under Kentucky law, punitive damages are available if the plaintiff can prove by clear and convincing evidence that the defendant acted with oppression, fraud, or malice.[10] Ky. Rev. Stat. Ann. § 411.184(2).  Punitive damages may also be awarded upon a showing of gross negligence.  *Williams v. Wilson*, 972 S.W.2d 260, 262-65 (Ky. 1998).  "[T]he prevailing understanding defines gross negligence as a wanton or reckless disregard for the safety of other persons."  *Kinney v. Butcher*, 131 S.W.3d 357, 359 (Ky. Ct. App. 2003).

---

10) Although the Kentucky Supreme Court held KRS § 411.184(1)© unconstitutional in *Williams v. Wilson*, it expressed "no opinion herein as to the constitutionality of KRS § 411.184(2)."  972 S.W.2d at 268.  "In subsequent decisions, the Kentucky Supreme Court has reiterated that KRS § 411.184(1)© is unconstitutional, but has applied other sections of the statute, specifically, KRS § 411.184(2)."  *Anderson v. Wade*, 33 F. App'x 750, 758-59 (6th Cir. 2002) (surveying Kentucky case law).  Therefore, the Court will follow the lead of the Sixth Circuit and the Kentucky Supreme Court and apply KRS § 411.184(2).

"It is not necessary that the jury find the defendant to have acted with express malice; rather, it is possible that a certain course of conduct can be so outrageous that malice can be implied from the facts of the situation." *Id.*

In *Kinney*, the Kentucky Court of Appeals held that "traveling at a possible speed of ten miles per hour in excess of the posted speed limit and failing to complete a pass before entering a no-passing zone constitute nothing more than ordinary negligence." *Id.* The court reasoned as follows:

> Were we to accept Kinney's argument that [this conduct] amounts to wanton or reckless disregard for the safety of others, it would effectively eliminate the distinction between ordinary negligence and gross negligence in the context of automobile accidents. Nearly all auto accidents are the result of negligent conduct, though few are sufficiently reckless as to amount to gross negligence, authorizing punitive damages. We are of the opinion that punitive damages should be reserved for truly gross negligence as seen in cases such as *Shortridge v. Rice*, *Stewart v. Estate of Cooper*, and *Phelps v. Louisville Water Company*. In *Shortridge* and *Stewart*, the defendant tortfeasors were driving while intoxicated; and, in *Phelps*, the jury was presented with eighteen instances where Louisville Water Co. misrepresented the dangerous nature of a highway condition, violated its own safety policies, and disregarded the Manual on Uniform Traffic Control Devices, all of which evidenced a conscious disregard for public safety.

*Id.*

Having reviewed the record in detail, the Court sees no evidence that Turner's conduct amounts to anything more than ordinary negligence. His alleged decisions on the day of the accident include failing to conduct a pre-trip inspection, failing to honk or swerve, pumping the brakes in an effort to stop, and reconnecting the detached brake line at the accident scene. (Doc. # 135 at 5). There is no evidence in the record to suggest that he made these decisions with a wanton and reckless disregard for the safety of other persons. Stated simply, Turner's conduct is akin to that at issue in *Kinney*, rather than that

24

discussed in *Shortridge*, *Stewart* and *Phelps*.

Nevertheless, Gordon believes that these acts and omissions, considered together, are sufficient to support an award of punitive damages. (*Id.*). To support this position, Gordon cites *MV Transportation, Inc. v. Allgeier* for the proposition that "[e]ven where a single act of negligence might not constitute gross negligence, gross negligence may result from the several acts." *MV Transp. v. Allgeier*, 433 S.W.3d 324, 338 (Ky. 2014) (quoting *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388 (Ky. 1985)). However, *Allgeier* presented an unusual and much more egregious set of facts than this case. *Id.*

In *Allgeier*, a handicapped passenger's wheelchair tipped over as she was attempting to disembark from a para-transit bus. *Id.* at 328. Because the wheelchair was connected to the vehicle by a safety strap, and because the passenger was wearing a safety belt, she was essentially suspended in midair. *Id.* The bus driver released the passenger's safety belt, causing her to fall to the ground and fracture both femurs. *Id.* Instead of calling 911, the driver called her company's dispatcher, who sent two of supervisors to the accident scene. *Id.* Upon arrival, these supervisors sought emergency medical assistance, but minimized the urgency of the situation by telling first responders that the passenger was only experiencing back pain. *Id.* They then "busied themselves with taking pictures and sequestering [the passenger] from any inquiries about the incident[,]" paying "little attention to [her] plight." *Id.*

The court relied heavily on these facts in determining that an award of punitive damages was warranted, reasoning as follows:

25

> From the evidence a jury could have reasonably concluded that in the aftermath of [the driver's] initial ordinary negligence that caused Allgeier to fall, MV agents, including [the driver], following policies put in place by MV, placed its own financial self-interests ahead of Allgeier's urgent need for medical assistance, and callously left Allgeier suffering helplessly in dire pain and distress in subfreezing weather for an unnecessarily prolonged period of time.

*Id.*

Even considered *in toto*, Turner's acts and omissions do not constitute gross negligence. There is simply no indication that Turner did anything more than make poor driving choices that left him unable to avoid a collision. This is not a situation like *Allgeier*, where the defendants failed to seek emergency care for a fellow human being in severe pain for the sake of financial self-preservation. Accordingly, Turner is entitled to summary judgment on Gordon's punitive damages claim.

Under Kentucky law, punitive damages cannot be assessed "against a principal or employer for the act of an agent or employee[11] unless such principal or employer authorized or ratified or should have anticipated the conduct in question." Ky. Rev. Stat. Ann. § 411.184(3); *see also Berrier v. Bizer*, 57 S.W.3d 271, 283 (Ky. 2001) (noting that "Kentucky is the only state with a statute that so broadly limits vicarious liability for punitive damages"). Because the Court has already concluded that Turner's actions do not rise to the level of gross negligence, neither IFCO nor Trillium can be liable for punitive damages

---

11) Gordon asserts vicarious liability and direct liability claims against IFCO and Trillium. It is unclear whether her claim for punitive damages against those two Defendants is predicated solely on vicarious liability, or whether she also seeks punitive damages in relation to her direct liability claims. If Gordon does indeed seek punitive damages for IFCO's and Trillium's alleged negligence in hiring, training, retaining, and supervising Turner, her request must fail because the Court has granted summary judgment in IFCO and Trillium's favor on those claims. *See Russell v. Rhodes*, Nos. 2003-CA-000923-MR, 2004-CA-000492-MR, 2005 WL 736612 at *5 (Ky. App. Apr. 1, 2005) (explaining that dismissal of a punitive damages count is proper when the underlying tort claims have been dismissed).

26

on a vicarious liability theory.[12]  Therefore, they are also entitled to summary judgment on Gordon's punitive damages claim.

## IV.    Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendant Universal Fleet & Tire Service, Inc.'s Motion for Summary Judgment (Doc. # 123) be, and is, hereby **GRANTED IN FULL**.  Accordingly, summary judgment is entered in Universal Fleet's favor as to **Count III** (negligence), **Count V** (negligence *per se*), and **Count XI** (punitive damages).

(2)    Defendant Pallet Companies, Inc., d/b/a IFCO Systems, LLC's Motion for Summary Judgment on the Issue of Punitive Damages (Doc. # 125) be, and is, hereby **GRANTED IN FULL**.  Summary judgment is therefore entered in IFCO's favor as to **Count XI** (punitive damages);

(3)    Defendant Tenorris F. Turner's Motion for Summary Judgment on the Issue of Punitive Damages (Doc. # 128) be, and is, hereby **GRANTED IN FULL**.  Summary judgment is therefore entered in Turner's favor as to **Count XI** (punitive damages);

(4)    Defendant Midwest Construction Services, Inc., d/b/a Trillium Driver Solutions' Motion for Summary Judgment (Doc. # 129) be, and is, hereby **GRANTED IN PART and DENIED IN PART**.  Trillium is entitled to summary judgment as to **Count III** (negligence), **Count V** (negligence *per se*), **Count VI** (negligent hiring), **Count VII**

---

12) Gordon also sought punitive damages against Universal Fleet.  (Doc. # 51).  This claim fails because the Court granted summary judgment in Universal Fleet's favor on the negligence and negligence per se claims.  *See Russell*, 2005 WL 736612 at *5.

(negligent training), **Count VIII** (negligent supervision), **Count X** (negligent retention), and **Count XI** (punitive damages).  Trillium is **not** entitled to summary judgment as to **Count II** (vicarious liability);

(5)     Plaintiff Tiffany Gordon's Motion for Hearing (Doc. # 143) be, and is, hereby **DENIED AS MOOT**;

(6)     The following claims remain in this action: **Count I** (negligence) against Turner; **Count II** (vicarious liability) against Trillium and IFCO; **Count III** (negligent maintenance) against IFCO; **Count IV** (negligence *per se*) against Turner; **Count V** (negligence *per se*) against IFCO; **Count VI** (negligent hiring) against IFCO; **Count VII** (negligent training) against IFCO; **Count VIII** (negligent supervision) against IFCO; **Count IX** (negligent entrustment) as to IFCO; and **Count X** (negligent retention) against IFCO; and

(7)     Because none of the remaining claims pertain to Defendant Universal Fleet, it be, and is, hereby **DISMISSED** as a Defendant in this action.

This 29th day of June, 2016.



Signed By:
*David L. Bunning*
United States District Judge